UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:25-CR-350-PGB-RMN |
| | ) | |
| MARK LOFTIS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT MARK LOFTIS'S RENEWED MOTION
FOR JUDGMENT OF ACQUITTAL PURSUANT
TO RULE 29(c) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

The Defendant, Mark Loftis, by and through his undersigned counsel,

hereby moves this Honorable Court for a judgment of acquittal pursuant to Rule

29(c) of the Federal Rules of Criminal Procedure.  As set forth below, Dr. Loftis

asserts that the government failed to sufficiently prove: (1) that Dr. Loftis acted

with the requisite *mens rea* of willfulness and intent to defraud; (2) that the single

conspiracy charged in the indictment existed; (3) that Dr. Loftis could be

committed of healthcare fraud based on alleged Anti-Kickback Statute violations

or payments of "kickbacks" and "bribes;" (4) that venue was proper in the Middle

District of Florida; and (5) that the charged conspiracy was not barred by the

statute of limitations.  In support thereof, Dr. Loftis states as follows:

1

## STATEMENT OF FACTS

### *The Allegations*

On December 17, 2025, a federal grand jury returned the operative indictment charging Dr. Loftis with (1) conspiracy to commit health care fraud and wire fraud, (2) conspiracy to defraud the United States and to violate the Anti-Kickback Statute, (3) two counts of theft of government property.  Doc. 1.

On July 2, 2026, the government moved to dismiss Counts 2, 3, and 4, and the Court granted the motion.  Doc. 80, 82.

The allegations in this case concerned Back Pain Home Supplies and LJM Medical, two companies that were owned by Dr. Loftis.  Back Pain Home Supplies was formed in 2016 and became an enrolled Medicare provider in 2016.  In September 2017, Dr. Loftis agreed to work with Greg Simms on a "telemed project" that involved supplying braces to Medicare patients.  In 2019, Dr. Loftis formed LJM Medical as a separate company and continued to operate Back Pain Home Supplies after stopping his relationship with Mr. Simms.

### *The Government's Case-In-Chief At Trial[1]*

Dr. Loftis's trial began on July 6 and lasted through July 20.  During the

---

[1]     The undersigned does not have the benefit of all the transcripts from the trial. Thus, the factual representations in this motion are based on the undersigned's recollection of the trial testimony and evidence.

2

government's case in chief, the government called several witnesses who had no interaction with Dr. Loftis, including government experts, two government case agents, a financial analyst, a patient who received braces, and the relatives of some patients.

Regarding conduct in late 2018 and early 2019, the government called two cooperating witnesses who pled guilty in separate cases and had some contact with Dr. Loftis and Mr. Simms – William Novack and Charles Kasbee – as well as another witness who worked with Mr. Novack and interacted with Dr. Loftis and Mr. Simms – Samantha Mahnke.

Regarding conduct in early 2018 and late 2019, the government called Zeeshan Hayat, a cooperating witness who pled guilty in a separate case. Mr. Hayat had no contact with Dr. Loftis and testified about his understanding of emails involving his wife, who was not called as a witness.

Regarding conduct in 2019 and 2020, the government called Arthur Henderson, who pled guilty in a separate case and ran a call center, Summit Marketing Solutions, that worked with Dr. Loftis. The government also called Charles Schwartz, who pled guilty in a separate case and testified about his relationship with Dr. Loftis in 2019.

In addition to emails involving the government witnesses and their

3

companies, the government also presented multiple emails from 2017 through 2019 with Mr. Simms, emails from 2018 involving Elite Healthcare Solutions, a marketer that interacted with Dr. Loftis and Mr. Simms.  The government also presented emails from 2019 involving Dr. Loftis's relationships with Medtech and with Howard "Hank" Bloom, who also was involved with a call center that worked with Dr. Loftis.

### *Dr. Loftis's Defense Case*

As set forth herein, Dr. Loftis maintains that the government failed to demonstrate beyond a reasonable doubt that he acted willfully, i.e., with the bad purpose to disobey or disregard the law.  Moreover, Dr. Loftis asserts that his honestly held opinions, based on information he was receiving and his consultations with others, demonstrated his good faith.  Accordingly, the government failed to prove beyond a reasonable doubt that he acted willfully, had a fraudulent intent, or agreed with another person to commit health care fraud or wire fraud.

On July 16, 17, and 18, 2026, Dr. Loftis testified and was cross-examined.

During his testimony, Dr. Loftis explained that he had believed that Back Pain Home Supplies was submitting valid claims to Medicare for braces that were requested by a patient and that were ordered by a doctor who had conducted an

4

appropriate evaluation of the patient and who had determined the braces met Medicare's criteria. He also explained that he did not know in 2018 that payments to marketers like True Alliance and Prizm were illegal or that the contracts he signed had compensation terms that differed from the arrangements that he believed were legal.

Dr. Loftis acknowledged that he came to learn more about the Anti-Kickback Statute in and around late March and April 2019 based on discussions with a lawyer and upon learning about Operation Brace Yourself, a coordinated Department of Justice action involving fraud with durable medical equipment and telemedicine.

Dr. Loftis testified that he was aware as of March/April 2019 that payments to marketers could violate the Anti-Kickback Statute and that he took steps that he believed made payments to Summit Marketing Solutions exempt from the Anti-Kickback Statute because of his belief that the payments complied with a safe harbor to the Anti-Kickback Statute.

Dr. Loftis also testified that he was aware as of March/April 2019 that payments to Medtech could violate the Anti-Kickback Statute if the payments ultimately resulted in doctors being paid and influenced to order braces. He testified that he was told that Medtech was separate from the company that

5

employed physicians, Real Time Physicians, and that he thus believed that the payments to Medtech were not illegal until early 2020.

Dr. Loftis also testified that he believed in 2019 that Back Pain Home Supplies billed claims to Medicare only for patients who requested the braces and based on orders by doctors.

Dr. Loftis testified that he made changes as he learned more information about Medicare's rules. He testified that he stopped billing the L0650 code for braces in August 2019 upon determining that doctors were required to have face-to-face encounters with patients for those braces, and that he stopped the use of telemedicine entirely in early 2020 when he came to doubt Medtech's representations to him and terminated the relationship.

Dr. Loftis testified that he came close to violating the law in 2019 when he considered selling brace orders to a brace company operated by Peter Roussinicolos. Dr. Loftis testified that he had learned that the brace orders were not valid, that he discussed transferring the orders to Roussinicolos's company, but that he ultimately decided not to do so.

Dr. Loftis also testified about 2019 invoices from Hank Bloom. He testified that he wanted Bloom to bill him on an hourly basis and that he was concerned about an invoice in which Bloom charged him on a per-lead basis. Dr. Loftis

6

acknowledged that he did ask Bloom to change the invoice and testified that he wanted Bloom to charge him on an hourly basis in order to comply with a safe harbor to the Anti-Kickback Statute.

Dr. Loftis also testified about emails with Prizm in late 2019. He testified that he did not believe that payments to Prizm in late 2019 on a per-order basis were prohibited because Prizm's business model had changed so that it asked doctors to sign orders rather than using telemedicine doctors. Dr. Loftis testified that he was then told by a lawyer that payments to Prizm on a per-order basis were illegal under the Anti-Kickback Statute. Dr. Loftis testified that he did not make any additional payments to Prizm as a result but did not believe that he had violated the law by making an earlier payment to Prizm or by finishing an existing campaign or project with Prizm.

### *Rule 29 Motions*

During the trial, Dr. Loftis moved for a judgment of acquittal under Rule 29 at the close of the government's case-in-chief. Doc. 121. The Court denied this motion. Doc. 122. Dr. Loftis renewed his motion at the close of the evidence on July 20, and the motion was denied.

### *Closing Arguments*

On July 20, 2026, the parties made their closing arguments to the jury. Via

7

counsel, Dr. Loftis argued that the government failed to prove beyond a reasonable doubt that he acted willfully or that he had an intent to defraud and thus was not guilty of conspiracy to commit health care fraud or wire fraud.

### *Jury Verdict*

On July 21, 2026, the jury found Dr. Loftis guilty of conspiring to commit health care fraud and wire fraud.  Doc. 131.  The Court has scheduled Dr. Loftis's sentencing for October 7, 2026 at 10:00 a.m.  Doc. 135.

## **MEMORANDUM OF LAW AND ARGUMENT**

### *Legal Standard under Rule 29*

When a defendant moves for a judgment of acquittal pursuant to Rule 29, the court views the evidence "in the light most favorable to the government" and decides "whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Ward*, 274 F. 3d 1320, 1323 (11th Cir. 2001) (internal quotations omitted).  Regarding the burden of proof in a criminal case, the U.S. Supreme Court has aptly stated:

> The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

*In re Winship*, 397 U.S. 358, 363-364 (1970).  In this same opinion, the Supreme Court

"explicitly [held] that the Due Process Clause protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary

to constitute the crime with which he is charged."  *Id.* at 364.  Thus, this Honorable

Court must determine whether "any rational trier of fact [would] have found all

the essential elements of the crime beyond a reasonable doubt."  *See United States

v. Lopez*, 403 Fed. App'x 362, 370-71 (11th Cir. 2010).  Where "there is a lack of

substantial evidence, viewed in the Government's favor, from which a reasonable

factfinder could find guilt beyond a reasonable doubt, the conviction must be

reversed."  *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989).

### *Insufficient Proof of Mens Rea*

"As a general matter, when used in the criminal context, a willful act is one

undertaken with a bad purpose."  *Bryan v. United States*, 524 U.S. 184, 191 (1998)

(internal citations omitted).  In a case involving willfulness, the government must

prove that "the defendant acted with knowledge that his conduct was unlawful."

*Id.* (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see also United States v.

Dominguez*, 661 F.3d 1051, 1072 (11th Cir. 2011); *United States v. Haun*, 494 F.3d

1006, 1009 (11th Cir. 2007).  Similarly, "'good faith' is a complete defense to a

charge that requires intent to defraud."  *United States v. Goff*, 400 F. App'x 507, 510

9

(11th Cir.2010) (quoting Eleventh Cir. Pat. Jury Instr. 17).

There was no direct proof that Dr. Loftis acted with a willful intent or an intent to defraud. In fact, there was proof in the record that he acted and behaved as an individual who genuinely believed that his actions were lawful. He tried to understand the law through his own research and through consulting with an attorney, he refused to bill orders that he believed were improper in August 2019 (while coming close to violating the law by selling the orders to Peter Roussinicolos), he made changes in his business over the course of 2019 in ways that significantly reduced his business's billings to Medicare, and he stopped the use of telemedicine in early 2020.

These actions are wholly inconsistent with someone who intended to violate the law or planned to defraud the government. Additionally, as noted above, the Anti-Kickback Statute is a confusing statute that the government here interpreted in a way that had not been adopted by a court as of 2019 and that arguably conflicts with two appellate court decisions since 2019.[2]

Before March 2019, the only evidence regarding Dr. Loftis's knowledge of

---

[2] In *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025), the Seventh Circuit held that paying marketers for "doctor's orders" was not a violation of the Anti-Kickback Statute when there was no evidence the marketers made choices about medical orders or about the choice of provider. *Sorensen* expanded upon a ruling by the Fifth Circuit Court of Appeals in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024).

the Anti-Kickback Statute showed that he was given incorrect information by Greg Simms. *See* Defense Exhibit 69 (February 7, 2019 email string between Dr. Loftis and Mr. Simms).

Beginning in late March 2019, Dr. Loftis consulted an attorney and gained a better understanding of the Anti-Kickback Statute, but he was not told by an attorney that payments to marketers for qualified leads violated the law; he was told that "the agencies tasked with enforcing these regulations have *likened* 'qualified leads (defined further herein) as *akin* to 'referrals,' and thus individuals/entities involved in healthcare marketing should not be buying/selling qualified leads on a per lead basis or else *risk* running afoul of these laws" (emphasis added). Defense Exhibit 92 (April 2, 2019 email from Michael Silverman). Dr. Loftis then worked with Mr. Silverman to attempt to comply with the law as he understood it, including using a new contract with Summit Marketing Solutions.

In contrast to the foregoing, the government presented circumstantial evidence of Dr. Loftis's knowledge of the law and his overall intent. "'The test for sufficiency of the evidence is identical, regardless of whether the evidence is direct or circumstantial,' but if the government relied on circumstantial evidence, 'reasonable inferences, not mere speculation, must support the conviction.'"

11

*United States v. Clay*, 832 F.3d 1259, 1293 (11th Cir. 2016) (quoting *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015)).  Dr. Loftis asserts that the circumstantial evidence presented failed to demonstrate his knowing participation in the fraud scheme alleged in the indictment.  Instead, the jury was asked to speculate that he acted willfully and with an intent to defraud, based on documents and the money flow.  Such speculation cannot support his convictions in this case.

Significantly, the government attempted to meet its burden by arguing that signs of fraud and illegality were obvious to other people, suggesting that Dr. Loftis accordingly must have known.  But signs of fraud and illegality that may be obvious to government witnesses in 2026 are irrelevant to Dr. Loftis's state of mind in the charged time period.  The medical records signed by doctors may be clearly insufficient to the government's expert, Dr. Phil Colmenares, but they were not so to Dr. Loftis, especially when a Medicare auditor for Noridian did not bring up the same concerns in 2018 and 2019 that Dr. Colmenares testified about.  The calls that concerned Samantha Mahnke in 2019 were not enough to make her a co-conspirator, just as the calls were not enough to establish that Dr. Loftis acted with intent to defraud.  And the emails about patient complaints were not enough since most patients did not complain and since Dr. Loftis believed that Greg Simms and DME Advanta were handling such complaints appropriately.

12

Overall, without such improper evidence and argument, the evidence was insufficient for a reasonable jury to conclude that Dr. Loftis acted willfully and with intent to defraud.

### *Failure To Prove Single Conspiracy*

The Eleventh Circuit has recognized that "[a] material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). The Eleventh Circuit has described the issue of variance between indictment and trial evidence as "one form of challenge to the sufficiency of the evidence." *United States v. Jenkins*, 779 F.2d 606, 616 (11th Cir. 1986).

Here, there would have been a single conspiracy if the government's evidence had established that there was a "key man" who "direct[ed] the activities, coordinating the individual efforts of various combinations of people." *United States v. Anderson*, 326 F.3d 1319 (11th Cir. 2003). But while Dr. Loftis may have been the "key man" for the conduct from the spring of 2019 through October 2020, the evidence showed that Greg Simms was the "key man" from September 2017 through at least early 2019. Mr. Simms was the one who proposed the

13

"telemedicine project" and coordinated with the supplier (Rehab Health), the marketers (unidentified at trial), the telemedicine doctors involved, whatever companies may have employed the telemedicine doctors, and with other clients like Back Pain Home Supplies, such as Discover DME (a company run by Dustin York). Mr. Simms's company was the one that benefited far more from the "telemedicine project" than Dr. Loftis or his company, receiving 95 percent or more of the Medicare payments in that period.

Given all this, even if the government's evidence was sufficient to prove two conspiracies that Dr. Loftis may have been involved with, it was not sufficient to prove the single conspiracy charged in the indictment.

### *Failure To Prove False Statements to Medicare Based on Alleged Anti-Kickback Violations or "Kickbacks" or "Bribes"*

In *United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007), the Eleventh Circuit held that the payment of kickbacks in a manner that violates the Anti-Kickback Statute is not "sufficient to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare." In so concluding, the Eleventh Circuit rejected the government's claim that Medicare claims "tainted" by Anti-Kickback Statute violations constitute health care fraud under the theory that Medicare would not have paid the claims had it known about the Anti-Kickback Statute violations. *Id.*

14

Under *Medina*, the only way that an alleged violation of the Anti-Kickback Statute could support a charge of health care fraud would be if false and fraudulent representations were made to Medicare.  In *Medina*, the Eleventh Circuit upheld the conviction of a single defendant because she had submitted a certification to Medicare attesting her company would abide by all of Medicare's rules and regulations.  485 F.3d at 1298.  The Circuit concluded that because that defendant had been engaged in paying kickbacks before signing the certification and continued to pay kickbacks after signing the certification, her attestation that she would abide by Medicare's rules was false because she had no intention of following the rules when she signed the document.  *Id.*  The certification, therefore, established the "false representation" to Medicare that is a required element of health care fraud.  *Id*.

Accordingly, the only way that Anti-Kickback Statute violations could support the verdict in Count One would be if Dr. Loftis falsely certified to Medicare that he would not make payments in violation of the Anti-Kickback Statute.  There was insufficient evidence for the jury to make such a finding.

First, when Dr. Loftis signed certifications for Back Pain Home Supplies in 2016, this was approximately a year before Dr. Loftis got involved with Mr. Simms's "telemedicine project."  There was no evidence that this certification was

15

false regarding Dr. Loftis's intent to not violate the Anti-Kickback Statute.

Second, in May 2019, when Dr. Loftis signed a new certification for Back Pain Home Supplies, he was not working with Prizm (the company associated with Zeeshan Hayat), True Alliance (the company associated with William Novack and Samantha Mahnke), JKM3 (the company associated with Charles Kasbee), or Elite.  He was working with Summit Marketing Solutions and with Medtech, but there was insufficient evidence that the payments he was making in and around May 2019 violated the Anti-Kickback Statute or that Dr. Loftis knew that such payments violated the Anti-Kickback Statute.

Regarding Summit, the evidence showed that Dr. Loftis was paying Summit to make calls to people whom he believed had responded to advertising and who were interested in braces.  The people making such calls did not make medical decisions on behalf of the patients or the doctors, and thus payments to those people did not implicate the Anti-Kickback Statute.  Even if the payments were covered by the Anti-Kickback Statute, the evidence showed that Dr. Loftis believed that the payments were covered by a safe-harbor to the Anti-Kickback Statute.

Regarding Medtech, the evidence showed that Dr. Loftis was paying Medtech for every assessment that he believed was done by a doctor using

16

Medtech's software.   While Dr. Loftis agrees that it would violate the Anti-Kickback Statute if his company made payments indirectly to a doctor in order to influence the doctor's medical decision-making, there was no evidence that Medtech actually transferred any money to any doctor, and there was no testimony from any doctors or other evidence indicating that any such payments or transfers that may have occurred actually improperly influenced doctors' medical decisions.   Accordingly, there was insufficient evidence for the jury to conclude that payments to Medtech violated the Anti-Kickback Statute.   And even if the payments to Medtech did violate the Anti-Kickback Statute, the evidence was insufficient to show that Dr. Loftis knew that such payments were illegal.

Accordingly, there was insufficient evidence that Dr. Loftis made a false certification to Medicare in May 2019 when he signed a new certification for Back Pain Home Supplies, and thus there was insufficient evidence for Count One in terms of alleged Anti-Kickback Statute violations.

Moreover, there was insufficient evidence that Dr. Loftis agreed to pay illegal "kickbacks" and "bribes" as recognized apart from the Anti-Kickback Statute and as part of the alleged scheme to defraud.   Kickbacks and bribes are subsets of payments that violate the Anti-Kickback Statute, and such terms relate to payments that improperly employees or agents in ways that cause them to

17

breach their fiduciary duty to their employer or client.  *See, e.g., Skilling v. United States*, 561 U.S. 348, 401 (2010) (discussing bribes and kickbacks), *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) ("The defining characteristic of a kickback is divided loyalties").  There was no evidence that True Alliance, Prizm, Summit Marketing Solutions, Medtech, or any other company paid by Back Pain Home Supplies owed any duty to patients or doctors, and thus there was insufficient evidence indicating that payments to such marketers constituted "kickbacks" and "bribes."

### *Failure To Prove Venue Lies In the Middle District of Florida*

Turning to venue, the government's evidence failed to demonstrate by a preponderance of the evidence that venue was proper in the Middle District of Florida.

While the prosecution may satisfy venue at the charging stage with allegations in the indictment, at trial "[t]he prosecution must prove venue by a preponderance of the evidence."  *United States v. Crane*, 635 F. App'x 661, 663 (11th Cir. 2015).  The Eleventh Circuit has explained that "the preponderance standard is not toothless [and requires] reliable and specific evidence."  *See United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009) (internal citations omitted).  On a motion for judgment of acquittal under Fed. R. Crim. P. 29, the defendant must

18

show that no reasonable juror could conclude by a preponderance of the evidence that venue exists. *See, e.g., United States v. Gaughan*, 431 F. Supp. 3d 686, 689 (D. Md. 2020) (citations omitted).

Venue is proper at the *locus delicti*—the place where the charged offense was committed. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278-79 (1999). The *locus delicti* is determined by "the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 279 (internal quotation marks omitted); *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998) (same). The first step of the inquiry is to identify the "essential conduct elements" of the charged crime. *United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022). The second step of the inquiry is to "discern the location of the commission of the essential conduct elements, which are the only relevant elements for venue, and determine whether the location of their commission is the same as the location of the trial." *Id.*

For conspiracy offenses, the Eleventh Circuit has found venue in criminal cases based on the conduct of a defendant and co-conspirators, and it has rejected venue based on the effects of a crime unless an essential element of the crime is defined in terms of the effect of an act. See *United States v. Smith*, 22 F.4th 1236, 1243-44 (11th Cir. 2022) (rejecting the government's arguments that the effects of a crime are a basis for venue unless the offenses "contained an essential element of

19

the crime that we understood to be defined in terms of the effect of an act," as in an obstruction of justice case or a failure to pay child support case), *affirmed*, 599 U.S. 236 (2023), *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) (discussing venue in a conspiracy case terms of the performance of overt acts by a defendant and co-conspirators, without separate reference to effects). *See also Abouammo v. United States*, 608 U.S. ___, 2026 WL 1686084, *2 (2026) (rejecting government's argument that venue can be based on effects when the effects "were not elements of [a defendant's] crime and cannot figure in determining where his crime was committed").

Accordingly, there would be venue in the Middle District of Florida if there was sufficient evidence that Dr. Loftis performed overt acts in the Middle District of Florida or if he agreed to commit health care fraud or wire fraud with a co-conspirator who performed overt acts in the Middle District of Florida. But there was insufficient evidence of this.

First, the only government witness who definitely performed acts in the Middle District of Florida was William Novack, but the evidence was insufficient that Dr. Loftis agreed with Novack to commit health care fraud or wire fraud. Dr. Loftis's arrangement with Mr. Novack in late 2018 and early 2019 may have violated the Anti-Kickback Statute, but Dr. Loftis did not know that at the time,

20

and the arrangement ended before the 2019 certification to Medicare, and Dr. Loftis never agreed with Mr. Novack to submit claims for medically unnecessary braces to Medicare or any insurance.

Second, a government witness, Chuck Kasbee, testified that he worked with telemedicine companies that apparently are located in the Middle District of Florida. But there was insufficient evidence presented to establish that Dr. Loftis agreed to commit health care fraud or wire fraud with those telemedicine companies, especially when the government stipulated at trial that none of the orders that Mr. Kasbee sent to Mr. Simms and Dr. Loftis were billed to Medicare. Mr. Kasbee's testimony at best indicates that he worked with those telemedicine companies in the course of the crime that he pled guilty to, which largely involved genetic testing claims that cannot be said to be part of the same conspiracy here.

Third, some patients did receive braces in the Middle District of Florida and presumably received phone calls in the Middle District of Florida. But the Eleventh Circuit has not based venue on the receipt by victims of items or calls, but by where conspirators form their agreement or commit overt acts. *See, e,g, United States v. Kopituk*, 690 F.2d 1289, 1321 n. 30 (11th Cir. 1982) ("Venue in a conspiracy case is proper in any judicial district in which the conspiratorial agreement was formed or in any district where an overt act was committed in

21

furtherance of the conspiracy"), *citing Hyde v. United States*, 225 U.S. 347, 366 (1912) (finding venue for conspiracy where the agreement is entered into and in any place where coconspirators commit an overt act). *See also United States v. Schlei*, 122 F.3d 944, 975 (11th Cir. 1997) ("A conspiracy may be prosecuted in the district where it was formed or in any district where an overt act was committed in furtherance of its objects. An overt act may be that of only a single one *of the conspirators* and need not be itself a crime. An individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, *an overt act committed by any conspirator* is sufficient.") (internal citations and quotations omitted) (emphasis added). If venue could be based on where patients received braces or phone calls, then this case could have been brought in Hawaii (where 14 beneficiaries were located according to Government Exhibit 4), Wyoming (four beneficiaries), Alaksa (one beneficiary), or the U.S. territories (four beneficiaries), results that would eviscerate the point of the venue requirement. The location of patients in such locations would be enough to establish personal jurisdiction for purposes of a civil lawsuit by such patients, but it is insufficient to establish venue for a criminal case.

### *Failure To Prove the Conspiracy Extended Into the Limitations Period*

Finally, there was insufficient evidence that the conspiracy existed as of

22

November 11, 2019, five years before the parties executed the first of multiple tolling agreements. *See* Doc. 71 at 81 n. 58. By November 11, 2019, Dr. Loftis had stopped working with Mr. Simms, True Alliance, and others who had been involved beforehand, and he had stopped billing for L0650 back braces that were ordered by telemedicine doctors. Given these changes, there was insufficient evidence that the conspiracy with Mr. Simms that allegedly began in September 2019 existed within the statute of limitations.

<b><u>CERTIFICATION OF CONFERRING WITH OPPOSING COUNSEL</u></b>

The undersigned has conferred with the government which opposes this motion.

<b><u>CONCLUSION</u></b>

WHEREFORE, the Defendant, Mark Loftis, respectfully requests that this Court grant the instant motion and enter a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.

Respectfully submitted this August 4th, 2026.

<u>/s/ Stephen Chahn Lee</u>
Stephen Chahn Lee
Admitted *pro hac vice*
Law Office of Stephen Chahn Lee, LLC
33 N. Dearborn Street, Suite 1800
Chicago, IL 60602
312-436-1790
Email: slee@stephenleelaw.com

23

**ANDREW C. SEARLE, ESQ.**
Florida Bar No.  0116461
**SEARLE LAW P.A.**
200 East Robinson Street, Suite 1150
Orlando, Florida 32801
Telephone: 407-952-0642
Email: andrew@searle-law.com

*Attorneys for Mark Loftis*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system, which will send a notice of electronic filing

to all counsel in this case on August 4th, 2026.

/s/ Stephen Chahn Lee

24